## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:                                                    CHAPTER 7

OTINMA MONICK ROBINSON                       CASE NO. 1202313EE


Hon. Tracy Stidham Steen                                 Attorney for Debtor
P. O. Box 321257
Flowood, MS 39232-1257


Hon. Ronald H. McAlpin                    Attorney for Henry G. Hobbs, Jr.,
Assistant United States Trustee                Acting United States Trustee
501 East Court Street, Suite 6.430                                Region 5
Jackson, MS 39201


### MEMORANDUM OPINION ON
### *UNITED STATES TRUSTEE'S MOTION*
### *TO DISMISS PURSUANT TO 11 U.S.C. § 707(b)*

**THIS MATTER** came before the Court on the *United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 707(b)* (Dkt. #28) and the *Debtor's Response to United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 707(b)* (Dkt. #35). Having considered the motion, response, briefs and the evidence presented at the trial, the Court finds that the *United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 707(b)* (Dkt. #28) is well taken and should be granted unless the case is converted, with the consent of Otinma Monick Robinson (Debtor), to a

Chapter 11 or a Chapter 13 case within fourteen (14) days of the date of this Opinion.

## FINDINGS OF FACT[1]

On July 18, 2012, the Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.  Stephen Smith was appointed as the Chapter 7 Trustee (Trustee) for her bankruptcy case.

The Debtor is a Human Resources payroll specialist for Blue Cross Blue Shield of Mississippi (Blue Cross).  She has been employed by Blue Cross for seventeen (17) years.  According to the Debtor's *Summary of Schedules, Schedule I – Current Income of Individual Debtor(s)* (Dkt. #3) (Schedule I), the Debtor earns a gross salary of $4,710.84 per month.  Schedule I also shows that the Debtor is married and has two children, ages 13 and 5.

The Debtor's husband, Albert Darnell Robinson (Mr. Robinson), did not join his wife in filing this bankruptcy petition.  Mr. Robinson is a CommTech 4 for Comcast.  He has been employed with Comcast for sixteen (16) years.  Schedule I reflects that Mr. Robinson's gross monthly salary is $3,330.38.

According to Schedule I, the total net monthly income for the Robinson household is $6,464.99.

The Debtor filed Official Form 22A, *Chapter 7 Statement of Current Monthly Income and Means-Test Calculation* (Dkt. #5) (Original Means Test) on July 18, 2012.  On November 5, 2012,

---

[1]Pursuant to Federal Rule of Bankruptcy Procedure 7052, this opinion constitutes the Court's findings of fact and conclusions of law.  The matter before the Court is very fact intensive.  To the extent any of the Court's findings of fact are construed to be conclusions of law, they are adopted and deemed conclusions of law.  Likewise, to the extent any of the conclusions of law are construed to be findings of fact, they are adopted and deemed findings of fact.  *Brandt v. Trivest II, Inc. (In re Plassein Int'l. Corp.),* 405 B.R. 402, 405 n.1 (Bankr. D. Del. 2009).

the Debtor filed an amended means test (Dkt. #18) (Amended Means Test).

The Debtor filed her original *Schedule J – Current Expenditures of Individual Debtor(s)* (Dkt. #3) (Schedule J) on July 18, 2012. On November 5, 2012, the Debtor filed an *Amended Schedule J – Current Expenditures of Individual Debtor(s)* (Dkt. #18) (Amended Schedule J).

The Debtor's 11 U.S.C. § 341[2] Meeting of Creditors (341 Meeting) was held on September 14, 2012. The 341 Meeting was reset to October 12, 2012, at the request of the United States Trustee (UST). The October 341 Meeting was also reset at the request of the UST. The Debtor's 341 Meeting was eventually concluded on November 9, 2012.

On November 19, 2012, the UST filed its *Statement of Presumed Abuse* (Dkt. #20) (Statement). In the Statement, the UST stated that it had determined that the Debtor's case should be presumed to be an abuse under § 707(b) and that within 30 days, the UST would file either a motion to dismiss the case or a motion to convert.

The UST filed *United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 707(b)* (Dkt. #28) (Motion) on February 7, 2013.[3] In its Motion, the UST alleges that the Debtor has $310.06 in disposable income, and therefore, the Court should dismiss her case based upon the presumption of abuse that arises under § 707(b)(2). Alternatively, the UST requests that the Court dismiss the Debtor's case under the *totality of circumstances* test pursuant to § 707(b)(3).

On March 25, 2013, the Debtor filed the *Debtor's Response to United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 707(b)* (Dkt. #35) (Response). In her Response, the

---

[2]Hereinafter, all code sections refer to the Bankruptcy Code found at Title 11 of the United States Code unless specifically noted otherwise.

[3]The UST and the Debtor entered into agreed orders that granted the UST extensions of time in which to file its pleading.

Debtor denies that the presumption of abuse exists, but if it does, she alleges she has rebutted the presumption of abuse, and therefore, the Motion should be denied.

The Motion and Response were set for trial on April 24, 2013.  At the trial, the parties stipulated that the Debtor's debts were primarily consumer debts as defined in § 101(8).[4]  At the conclusion of the trial, the parties were instructed to establish a time frame for the submission of briefs.  On June 14, 2013, the UST filed its brief, and on June 28, 2013, the Debtor filed her brief. At that point, the Court took the matter under advisement.

## CONCLUSIONS OF LAW

### I.  Jurisdiction

This Court has jurisdiction of the subject matter and of the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.  This is a core proceeding as defined in 28 U.S.C. § 157(b)(1)(A).

### II. § 707(b)

The UST asserts that the Debtor's case should be dismissed because it was filed in violation of § 707(b).  The current version of § 707(b) was added to the Bankruptcy Code in 2005 when the United States Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).  Prior to 2005, a debtor enjoyed a presumption in his/her favor against a finding of abuse and a showing of *substantial abuse* was required in order to justify the dismissal of a Chapter 7 case.

The Court of Appeals for the Fourth Circuit in *McDow v. Dudley,* 662 F.3d 284 (4th Cir.

---

[4]Consumer debts are defined as debts "incurred by an individual primarily for a personal, family, or household use."  11 U.S.C. § 101(8).

4

2011), explains how BAPCPA changed both the presumption and the standard for abuse and gives

a good overview of § 707(b).

> The BAPCPA . . . repealed the "substantial" qualifier of "abuse" and altered the presumption favoring the debtor by adding a "means test" under which a Chapter 7 case can be found presumptively abusive. Under the means test, if the debtor's average monthly disposable income, as calculated under the statute, exceeds the statutory threshold, then the case is presumptively abusive and must be dismissed unless the debtor can show "special circumstances." 11 U.S.C. § 707(b)(2)(A)-(B). The BAPCPA also added § 707(b)(3), which authorizes the dismissal of a Chapter 7 case as abusive even when the means test does not create a presumption or the presumption is rebutted, giving the bankruptcy court the discretion to dismiss a case as abusive if there is "bad faith" or the "totality of the circumstances ... demonstrates abuse." *Id.* § 707(b)(3).
>
> The BAPCPA also made the determination of whether a Chapter 7 case is abusive a mandatory threshold question. Under the BAPCPA, the U.S. Trustee is *directed* to determine whether a case is presumptively abusive according to the means test and to file a statement about his conclusion within 10 days of the initial meeting of creditors. 11 U.S.C. § 704(b)(1)(A). Then, within 30 days of filing this statement, the U.S. Trustee *must* either file a motion to dismiss the case as presumptively abusive or file a detailed statement explaining why dismissal is not appropriate if the presumption has arisen from application of the means test. *Id.* § 704(b)(2).
>
> These new provisions manifest a congressional policy to police all Chapter 7 cases for abuse at the outset of a Chapter 7 proceeding, and they raise pragmatic considerations that indicate that the denial of a § 707(b) motion to dismiss is different from the denial of other motions to dismiss, such as those filed under Federal Rule of Civil Procedure 12(b) or 11 U.S.C. § 1112(b)(1)-(4). Section 707(b) requires that the U.S. Trustee apply the means test to Chapter 7 cases within a short time frame and, if the means test creates a presumption of abuse, to file a motion to dismiss the case within another relatively short time frame. Because of these strict time periods, which indicate that the issue is a threshold matter, the motion to dismiss a Chapter 7 case as abusive cannot be filed at any other time during the bankruptcy proceedings. Moreover, the U.S. Trustee is directed to apply the statutory means test and, if a presumption of abuse is created, to file the motion to dismiss or explain his decision not to. In contrast, under the dismissal provision in Chapter 11 proceedings, parties may bring an action to dismiss for "cause" under § 1112(b) throughout the bankruptcy proceedings, and the circumstances or events that constitute "cause" may arise at any time.

*McDow*, 662 F.3d at 288-89.

It should be noted that while BAPCPA did change the standard for dismissal from *substantial abuse* to *abuse*, "in analyzing the new § 707(b) the courts have recognized that it is 'best understood as a codification of pre-BAPCPA case law and, as such, pre-BAPCPA case law is still applicable when determining whether to dismiss a case for abuse.'" *Ng v. Farmer (In re Ng),* 477 B.R. 118, 126 (9th Cir. BAP 2012) (quoting *In re Clark,* No. 11-13612, 2012 WL 1309549, at *1-2 (Bankr. N.D. Cal. April 15, 2012.)); *see also In re Stewart,* 383 B.R. 429, 432 (Bankr. N. D. Ohio 2008); *In re Stewart,* 410 B.R. 912, 922 (Bankr. D. Or. 2009).

In considering whether a case is an abuse of Chapter 7 under § 707(b), a court must embark upon a two-part examination:

(1)  Under § 707(b)(2), the court must first examine the debtor's means test to determine whether the debtor's monthly disposable income exceeds the threshold amount.  If it does, the presumption of abuse arises, and the case must be dismissed unless the debtor rebuts the presumption by demonstrating *special circumstances*.  11 U.S.C. § 707(b)(2)(A)(i).

(2)  Under § 707(b)(3), if the means test does not create a presumption of abuse or the debtor rebuts the presumption, the debtor's case will be dismissed if there is *bad faith* or if the *totality of the circumstances* demonstrate abuse.  11 U.S.C. § 707(b)(3).

The Court will address each section separately.

### A.  § 707(b)(2)

### 1.  Overview

As noted above, BAPCPA significantly amended § 707(b).  Under § 707(b)(1), if the court finds that the granting of relief would be an *abuse,* the court may dismiss a Chapter 7 case filed by an individual whose debts are primarily consumer debts, or with the debtor's consent convert the

6

case to a Chapter 11 or a Chapter 13 case.

The court must first look to sub-section (b)(2) to determine if a presumption of abuse arises. Section 707(b)(2) requires the court to engage in a complicated series of calculations, commonly known as the *means test,* in order to determine whether the presumption arises. Below is an attempt to simplify this complicated mathematical exercise into "plain language":

> In one of the most profound changes in the 2005 Act, Congress added § 707(b)(2) to the Bankruptcy Code. Section 707(b)(2)(A) provides that, in considering whether the grant of Chapter 7 relief would be an abuse of the provisions of the Code, the court "shall presume abuse" if the debtor's "current monthly income" (a defined term) is not less than permitted expenses by a certain amount. In simple terms, a presumption of abuse exists and the court may dismiss the Chapter 7 case, or with the debtor's consent convert it to a Chapter 13 or 11 case, if the debtor's current monthly income reduced by allowable expenses as described in § 707(b)(2)(A)(ii), (iii), and (iv), when multiplied by 60 is not less than the lesser of either (1) 25% of the nonpriority unsecured claims or $7,475, whichever is greater, or (2) $12,475. Stated differently, if, after deducting all allowable expenses from a debtor's current monthly income, the debtor has less than $117.08 per month in net income (i.e., less than $7,475 to fund a 60-month plan), the filing is not presumed abusive. If the debtor has monthly net income of $195.42 or more (i.e., at least $12,475 to fund a 60-month plan), the filing is presumed abusive. Finally, if the debtor's net monthly income is more than $117.08 but less than $195.42, the case will be presumed abusive if that sum, when multiplied by 60 months, will pay 25% or more of the debtor's nonpriority, unsecured debts.
>
> For example, if the debtor had $100,000 in unsecured debt, the debtor would fail the means test and the Chapter 7 case could be dismissed or, with debtor's consent, converted if the debtor could pay at least $12,475 on the debt (that amount being less than 25% of his unsecured debt). If the debtor's unsecured debt were $30,000, debtor would fail the means test if debtor could pay $7,500 (25% of the debt, but greater than $7,475). If the debtor's unsecured debt were $20,000, the debtor would fail the means test if the debtor could pay $7,475 (that amount being greater than 25% of the unsecured debt).
>
> The means test calculation is based on the debtor's current monthly income and expenses on the date the petition was filed and is thus a snapshot of the debtor's financial situation at the date of filing. The means test is calculated using Official Form 22A.

Bankruptcy Law Manual § 10:18, printed p. 3 (5th ed.)(West) (footnotes omitted).

As noted, the parties stipulated that the Debtor's debts are primarily consumer debts as defined in § 101(8). Consequently, the Court must look to the means test to determine whether a presumption of abuse exists.

## 2. Means Test

Official Form 22A, *Chapter 7 Statement of Current Monthly Income and Means-Test Calculation* (Means Test), was added as an official form in 2005 with the enactment of BAPCPA. The Means Test is an essential element of BAPCPA. "The purpose of the means test is to distinguish between debtors who can repay a portion of their debts and debtors who cannot."[5]  The Means Test is a complicated formula where a debtor's income and expenses are compared to determine whether a debtor has monthly disposable income to pay his/her unsecured debts.

> The means test takes into account the debtor's monthly income and certain deductible expenses such as the cost of housing, utilities, taxes, health insurance and an allowance for food and clothing. 11 U.S.C. § 707(b)(2)(A). Some of these expenses may be calculated by using national or local standards. 11 U.S.C. § 707(b)(2)(A). The debtor's monthly disposable income is determined by subtracting these allowable expenses from his monthly income, and if that number is greater than a statutory benchmark then the presumption of abuse arises.

*Calhoun v. U.S. Trustee,* 650 F.3d 338, 341 (4th Cir. 2011).

In order to complete the Means Test, a debtor's *current monthly income* must be determined.

Under § 101(10A) of the Bankruptcy Code, *current monthly income* (CMI):

> (A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on--

>> (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of

---

[5]*Ross-Tousey v. Neary (In re Ross-Tousey),* 549 F.3d 1148, 1151 (7th Cir. 2008), *abrogated on other grounds by Ransom v. FIA Card Servs., N.A.,* 131 S.Ct. 716 (2011).

current income required by section 521(a)(1)(B)(ii); or

(ii) the date on which current income is determined by the court . . .
if the debtor does not file [such] schedule . . . and

(B) includes any amount paid by any entity other than the debtor (or in a joint case
the debtor and the debtor's spouse), on a regular basis for the household expenses of
the debtor or the debtor's dependents. . . .

11 U.S.C. § 101(10A) & (10B).

### 3.  Current Monthly Income

At the onset, the Court points out that "'[c]urrent monthly income' does not necessarily–in fact, very often does not–correspond to what the debtor is actually earning or receiving as income at the time of the filing."[6]

The Debtor asserts that the income of her non-filing spouse, Mr. Robinson, should not be included in determining her CMI because she asserts that Mr. Robinson does not contribute to the household expenses on a regular basis.  The Court disagrees and finds that Mr. Robinson's income should be included in calculating her CMI.  "In the context of Chapter 7 cases, the non-filing spouse's income has generally been considered in conjunction with a § 707 substantial abuse motion filed by the United States Trustee. *See In re Welch,* 347 B.R. 247 (Bankr. W.D. Mich. 2006); *In re Duncan,* 201 B.R. 889 (Bankr. W.D. Pa. 1996); *In re Falke*, 284 B.R. 133 (Bankr. D. Or. 2002); *In re Staub*, 256 B.R. 567 (Bankr. M.D. Pa. 2000)."  *In re Travis,* 353 B.R. 520, 526 (Bankr. E.D. Mich. 2006).   It is well accepted that a debtor must report a non-filing spouse's income on his/her Means Test even if the non-filing spouse does not contribute to household expenses.  For purposes of the Means Test presumption, however the debtor may subtract the income which is not used to

---

[6]Bankruptcy Law Manual § 10:18, printed p. 5 (5th ed.)(West) (footnote omitted).

pay household expenses of the debtor and the debtor's dependents.  This provision is called the *Marital Adjustment* and is found on Line 17 of the Means Test.  "[A] non-filing spouse's income must be included in 'current monthly income' to the extent that he or she contributes to the household expenses; and the portion of a spouse's income not expended regularly to pay household expenses is deducted from current monthly income as a 'marital adjustment.' *See In re Hammock,* 436 B.R. 343, 349 (Bankr. E.D.N.C. 2010); *In re Sale,* 397 B.R. 281, 286–87 (Bankr. M.D.N.C. 2007); *In re Quarterman,* 342 B.R. 647, 650–51 (Bankr. M.D. Fla. 2006)."  *In re Gregory*, No. 10-09739, 2011 WL 5902884, at *2 (Bankr. E.D.N.C. Aug. 17, 2011), *aff'd sub nom. Bankr. Adm'r v. Gregory*, 471 B.R. 823 (E.D.N.C. 2012).

In examining the Debtor's CMI, the Court finds that the Debtor's CMI is $107,423.76.  For a family of four in Mississippi, the median family income is $56,494.00.[7]  Since the Debtor's CMI is above the state median income, the Debtor was required to complete the remaining pages of the Means Test in order to determine her monthly disposable income and to determine whether the presumption of abuse is present.

### 4.  Monthly Disposable Income

For the purposes of a case filed under Chapter 13, disposable income is defined in § 1325(b)(2).  Generally, in a Chapter 13, a debtor's expenses are deducted from his/her current monthly income.  Disposable income is "income received by a debtor which is not reasonably necessary to be expanded for the maintenance or support of the debtor or a dependent of the debtor." *In re Jordan,* 428 B.R. 430, 433-34 (Bankr. N.D. Ohio 2010) (citations omitted).

---

[7]The Court notes that even without Mr. Robinson's income, the Debtor's annual salary of $64,609.56 is still above the state median income.

10

For the specific purposes of § 707, monthly disposable income is calculated by subtracting from a debtor's CMI the specific expenses allowed in § 707(b)(2)(A)(ii), (iii), and (iv).

In her Original Means Test,[8] the UST questioned three expenses claimed by the Debtor.[9] One expense in particular to which the UST objected, was the deduction on Line 24 for Mr. Robinson's vehicle. Because she was not obligated on this vehicle,[10] the Debtor was not entitled to claim on Line 24 the amount of $517.00 for a second vehicle (Mr. Robinson's vehicle).

When the deduction of $517.00 for Mr. Robinson's vehicle is removed from the Debtor's allowed expenses, the amount of the Debtor's monthly disposable income (Line 50) increases from $127.69 to $644.69.[11] Likewise Line 51 (*60-month disposable income under § 707(b)(2)*) increases from $7,661.40 to $38,681.40. Since Line 51 (*60-month disposable income under § 707(b)(2)*) is greater than $11,725, the presumption of abuse arises (Line 52).

If the discussion ended at this point, the burden would shift to the Debtor to rebut the presumption of abuse. However, after the UST questioned the Debtor's deductions on her Original Means Test, the Debtor filed amended schedules and an Amended Means Test. The Court must now turn to the Debtor's Amended Schedules and the Amended Means Test to determine whether the

---

[8]Trial Exhibit UST 1.

[9]The UST objected to deductions on Line 22B of $182.00 (public transportation expenses), Line 24 of $517.00 (vehicle ownership for a 2nd vehicle), and Line 34 of $524.00 (health insurance expenses).

[10]*See Ransom v. FIA Card Services, N.A.,* ___ U.S. ___, 131 S.Ct. 716, 725, 178 L.Ed. 2d 603 (2011).

[11]The Court notes that the $644.69 does not include the other amounts objected to by the UST (Line 22B $182.00 for public transportation expenses and Line 34 $524.00 for health insurance expenses). In her Amended Means Test, the Debtor removed the Line 22B $182.00 deduction and reduced the Line 34 deduction to $138.00. If all three changes were made to the Original Means Test, the Debtor's monthly disposable income would be even higher than $644.69.

11

presumption of abuse arises.

### 5. Amendment to Means Test

As noted above, the Debtor filed an Amended Means Test and an Amended Schedule J[12] on November 5, 2012.  On the Amended Means Test, the Debtor eliminated two of the expenses the UST had objected to that appeared on Line 22B (public transportation expenses) and Line 24 (vehicle ownership for a 2nd vehicle).  In addition, as to the third expense, the Debtor adjusted Line 34 (insurance premium deductions) downward–from $524.00 claimed on the Original Means Test to $138.00 claimed on the Amended Means Test.

The most significant change between the Original Means Test and the Amended Means Test, however, is found on Line 17, *Marital Adjustment:*

| Line Number | Original Means Test | Amended Means Test | Difference |
|---|---|---|---|
| 17. Marital Adjustment | | | |
| a.  Non-filing spouse's car payment | $500.00 | $500.00 | $0 |
| b.  Non-filing spouse's payroll deductions | $93.00 | $958.00 | $865.00 |
| c.  Non-filing spouse's separate obligations | $95.00 | $1,565.00 | $1,470.00 |
| Total | $688 | $3,023.00 | $2,335.00 |

With the amendments to her Original Means Test, including the elimination or reduction of expenses disputed by the UST, the Debtor calculated her Monthly Disposable Income (Line 50) to be a minus $548.55.   The Debtor again claims that the presumption of abuse does not arise.

At trial, the Debtor testified regarding Mr. Robinson's separate obligations, the largest

---

[12]Trial Exhibit UST 2.

12

component of the Debtor's Marital Adjustment.  However, Mr. Robinson did not testify nor did he appear at the trial.  In support of her testimony, the Debtor submitted copies of their joint bank statements.[13]   Of the $1,565.00 the Debtor claimed on Line 17(c) as Mr. Robinson's separate obligations, the Debtor was able to account for only $644.46 of the $1,565.00 with the following obligations:

|  |  |
|---|---|
| $294.46/mth | check for cash debt |
| $250.00/mth | repayment of loan to Debtor's parents |
| $100.00/mth | credit card |
| $644.46 | Total |

Transcript at 18-19.

In response to questions from her attorney, the Debtor mentioned that some of her husband's other monthly expenditures included cash withdrawals, overdraft charges, liquor store purchases, returned check fees, and purchases made at several bars.  *Id.* at 23-30.  In addition, the Debtor testified that she believed that he used some of the cash withdrawals for his saltwater aquarium.  *Id.* at 20.  The Debtor also stated that she did not know what Mr. Robinson did with the money he withdrew from their bank account.  She also testified that she did she know whether she benefitted from his use of these funds.  *Id.* at 33.

The bankruptcy analyst from the UST's office, Maria Baronich, (Mrs. Baronich) testified on behalf of the UST.  As part of her duties, Mrs. Baronich prepared several exhibits which were admitted at trial.  Trial Exhibit UST 13 is entitled *Means Test Analysis* and compares the Original Means Test and the Amended Means Test with the UST's adjustments to the Means Test.  The UST's recalculations were made due to either a correction based upon the information provided by

---

[13]Trial Exhibit D-1.

13

the Debtor or an adjustment based upon missing and/or unverified information.

Mrs. Baronich testified that the Debtor filed her case in July of 2012. In order to determine CMI for the Means Test, the income the Debtor and Mr. Robinson earned during the six (6) month period before they filed bankruptcy[14] would be the relevant time period.[15] In analyzing the Debtor's pay advices and Mr. Robinson's pay advices dated January 1, 2012, to June 30, 2012,[16] (6 Month Pay Advices) with the Debtor's two Means Tests, Mrs. Baronich found minor differences (less than $50.00) in Line 12 Current Monthly Income for § 707(b)(7) of the Debtor.[17]

In her further analysis of the Debtor's two Means Tests, Mrs. Baronich made three minor corrections:

■ A $94.22 difference between what the Debtor claimed on Line 34 (health insurance expenses) and what her 6 Month Pay Advices showed. On Line 34, the Amended Means Test claimed an expense of $138.00 whereas the 6 Month Pay Advices show the actual amount deducted was $43.78 per month.

■ Mrs. Baronich also removed from Line 42 (future payments on secured claims) the $46.37 listed for a payment to Tower Loan. Mrs. Baronich testified that although the Debtor has not done so yet, the Debtor's *Statement of Intent* stated that the Debtor intended to file a motion to avoid the lien of Tower Loan. Therefore, the Debtor would not have this expense of $46.37 per month.

---

[14] January 1, 2012, to June 30, 2012.

[15] Transcript at 44.

[16] Trial Exhibits UST 11 & 12.

[17] The Original Means Test and Amended Means Test both show a Line 12 CMI of $8,951.98. The UST's calculations show a Line 12 CMI of $8,986.45–a difference of $34.47.

▪If the Debtor was in a Chapter 13 case, she would pay administrative expenses to the Chapter 13 trustee.  Therefore, Mrs. Baronich added the expense of $158.58 to Line 45 (Chapter 13 administrative expenses).

The UST's analysis found major differences between what the Debtor claimed as a Marital Adjustment (Line 17) and what the UST asserts the Debtor is entitled to claim.  In Mrs. Baronich's analysis, she modified the Marital Adjustment as follows:

Means Test Analysis[18]

| Line Number | Original Means Test | Amended Means Test | UST's Calculations |
|---|---|---|---|
| 17. Marital Adjustment | | | |
| a.  Non-filing spouse's car payment | $500.00 | $500.00 | $500.00 |
| b.  Non-filing spouse's payroll deductions | $93.00 | $958.00 | $1,036.41 |
| c.  Non-filing spouse's separate obligations | $95.00 | $1,565.00 | $644.46 |
| –loan repayment to parents | | | $250.00 |
| –check for cash loan | | | $294.46 |
| –unknown credit card | | | $100.00 |
| TOTAL | $688 | $3,023.00 | $2,180.87 |

In summary, Mrs. Baronich found that the Debtor was entitled to a Marital Adjustment of $2,180.97 and not the $3,023.00 Marital Adjustment the Debtor claimed on her Amended Means Test.

At trial, Mrs. Baronich testified that she based her calculations on the information and documents the UST had obtained from the Debtor.  Prior to the trial on the Motion, the UST

---

[18]Trial Exhibit UST 13.

conducted a 2004 Exam[19] of the Debtor.  The Debtor was specifically instructed to bring "[a]ll checks or other evidence of payment for line 17 (marital adjustment) of the amended Chapter 7 Statement of Current Monthly Income and Means Test Calculation. . . for the period January 1, 2012, through December 31, 2012."[20]  The UST used the documentation the Debtor provided and her testimony at the 2004 Exam in determining the amount of the Marital Adjustment.

Based upon the UST's adjustments and calculations, the UST shows that the Debtor has Monthly Disposable Income of $310.06 per month and that a presumption of abuse exists:

(See next page.)

---

[19]Rule 2004 of the Federal Rules of Bankruptcy Procedure permits an examination of a Debtor. This examination is commonly referred to as a 2004 Exam.

[20]*Notice of Rule 2004 Examination*, Case No. 12-02313EE, Docket #26, January 10, 2013, unnumbered page 3.

Means Test Analysis[21]

| Line Number | Original Means Test | Amended Means Test | UST's Calculations |
|---|---|---|---|
| 48. CMI for §707(b)(2) | $8,263.98 | $5,928.98 | $6,805.58[22] |
| 49. Total of all deductions | $8,136.29 | $6,477.53 | $6,495.52 |
| 50. Mthly Disp. Income §707(b)(2) | $127.69 | ($548.55) | $310.06 |
| 51. 60-mth disp. Income §707(b)(2) | $7,661.40 | ($32,913.00) | $18,603.60 |
| 52. Presumption determination | | | |
| –If line 51 is less than $7,025 – no presumption | | XX | |
| –If line 51 is more than $11,725 – presumption arises | | | XX |
| –If line 51 is at least $7,025 but not more than $11,725 – complete remainder | XX | | |
| 53. Amt of unsec. debt | $94,240.13 | | |
| 54. Threshold debt payment (line 53 x 0.25) | $23,560.03 | | |
| 55. 2nd presumption determination | | | |
| –If line 51 is less than line 54 – no presumption | XX | | |

The Court finds that the Debtor failed to provide sufficient documentation or any other proof

---

[21]Trial Exhibit UST 13.

[22]The CMI on Line 48 is the figure listed on Line 18 *Current Monthly Income for § 707(b)(2)*. Line 18 CMI is the Debtor's CMI after the deduction for the Marital Adjustment.

17

to substantiate the entire $1,565.00 she claimed on for the Marital Adjustment on Line 17 of her Amended Means Test.  Since the Debtor could only substantiate $644.46, the Court finds that the Debtor's Monthly Disposable Income is $310.06, and that the UST has met its burden and shown that a presumption of abuse exists.  In order to rebut the presumption of abuse, the Debtor must prove *special circumstances* as contemplated by § 707(b)(2)(B)(i).

### 6. Special Circumstances

In order to justify the inclusion of additional expenses and rebut the presumption of abuse, the Debtor must prove *special circumstances*.  In the case at bar, the Debtor alleges that she has shown *special circumstances* to rebut the presumption of abuse.

The Bankruptcy Code does not define the term *special circumstances*.  Instead, two non-exclusive examples of what constitute *special circumstances* are found in § 707(b)(2)(B)(i).  Section 707(b)(2)(B) provides:

> (B)(i) In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative.
>
> (ii) In order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide--
>
> > (I) documentation for such expense or adjustment to income; and
> >
> > (II) a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable.
>
> (iii) The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required.

11 U.S.C. § 707(b)(2)(B).

Courts are generally in agreement that whether *special circumstances* exist must be

18

determined on a case-by-case basis. *In re Davis,* No. 10-47600, 2011 WL 5884015, at *4 (Bankr. N.D. Tex. Nov. 23, 2011); *DeAngelis v. Fonash (In re Fonash),* 401 B.R. 143, 147 (Bankr. M.D. Pa. 2008); *In re Champagne,* 389 B.R. 191, 200 (Bankr. D. Kan. 2008). However, courts are not in agreement as to what actually constitutes *special circumstances.*

There are two separate views, a narrow and a more broad, on how to determine what constitutes *special circumstances.* Under the narrow view, the circumstances must be similar to the two examples found in § 707(b)(2)(B)(i), or in other words, the circumstances must be truly extraordinary. In contrast, under the broad view, the standard is more lenient and may encompass more ordinary circumstances.[23]

While this is a decision involving a Chapter 7 case, a thorough analysis of the narrow view and the board view is found in the Chapter 13 case of *Davis*[24] and is applicable to the case at bar. In declining to follow the narrow view, the *Davis* court discussed the various cases which follow the different views of *special circumstances*:

> Some courts have interpreted special circumstances narrowly, often relying upon the "plain meaning" of the word "special" and finding that there is a significant burden to overcome. *See In re Siler,* 426 B.R. 167, 172 (Bankr. W.D. N.C. 2010)(collecting cases); *see also In re Haar,* 360 B.R. 759, 760 (Bankr. N.D. Ohio 2007)(stating that Congress intended "to set this bar extremely high, placing it effectively off limits to most debtors"). Some courts viewing the exception narrowly have inferred that the special circumstance should be of the same degree or seriousness of the two examples listed in the statute—that is, a call to military duty or serious medical condition—and compare those circumstances with the debtor's to determine whether the deduction is allowable. *See, e.g., In re Delunas,* 2007 WL 737763, at *2 (Bankr. E.D. Mo. Mar. 6, 2007)(finding that circumstances should "rise to the same level" as those mentioned in the statute and noting that the examples contemplate "circumstances beyond a debtor's reasonable control") *citing In re Tuss,* 360 B.R.

---

[23]*In re Burdett,* No. 12-12066, 2013 WL 865575, at *3 (Bankr. E.D. Va. Mar. 7, 2013).

[24]*Davis,* 2011 WL 5884015.

684, 701 (Bankr. D. Mont.2007); *see also In re Johns,* 342 B.R. 626, 629 (Bankr. E.D. Okla. 2006)).

Other courts have adopted a broader approach to the interpretation of special circumstances and found that it does not necessarily mean the circumstances need be extraordinary, unanticipated or outside of the control of the debtor. *See In re Graham,* 363 B.R. 844, 850 (Bankr. S.D. Ohio 2007); *In re Robinette,* 2007 WL 2955960, at *4. (Bankr. D. N.M. Oct. 2, 2007); *In re Turner,* 376 B.R. 370, 378 (Bankr. D. N.H. 2007); *See also In re Fonash,* 401 B.R. 143, 146 (Bankr. M.D. Pa. 2008) (finding that the "burden to establish special circumstances was not set particularly high, making the presumption truly rebuttable. The standard ... is special, not extraordinary"). Courts following this approach also conclude that the circumstances need not be of the same degree as the examples mentioned in the statute and have found that the procedural requirements of section 707(b)(2)(B) are of primary importance. *See, e.g., In re Littman,* 370 B.R. 820, 831 (Bankr. D. Idaho 2007)(noting the limited utility of using the examples as archetypal as they do not share a common, understandable trait and emphasizing that "compliance with the requirements to itemize, document, verify, establish reasonableness and necessity, and prove 'no reasonable alternative' [is] key.")

The court agrees that the determination whether a particular circumstance is special should be made on a case-by-case basis. As to what constitutes a special circumstance, the court recognizes the need to give meaning to the term "special". However, the court also finds that the 707(b)(2)(B) leaves discretion with the court to account for differences between individual debtors. The focus must be on whether the debtor is, of necessity, in a different situation than the typical debtor addressed by the IRS guidelines. As such discretion is not otherwise provided for in the statute, 707(b)(2)(B) represents an important tool for the court to insure that a chapter 13 plan accurately accounts for a debtor's actual ability to pay. The court therefore rejects the reading of those courts which have followed an unnecessarily rigid definition of the term "special", such as by requiring a circumstance to be of equal gravity as those mentioned in the statute.

Instead, the court considers certain factors relevant in determining whether a circumstance is special within the meaning of 707(b)(2)(B). First, the court may examine what the IRS would have considered a normal or average expense in a given category when calculating the National or Local Standard. Second, the court may look to a debtor's circumstances to determine if they differ from that of a hypothetical typical person the IRS would consider when formulating the standard. Third, the court may consider whether a debtor has a reasonable alternative to incurring the expense or could feasibly lower the amount of the expense.

Lastly, the court may view a debtor's situation holistically when deciding whether a given expense is reasonable; it is quite possible that an expense that looks facially

20

unreasonable would be reasonable when viewed in light of other facts. By way of example, in the case at hand, Debtors' rural location and choice of home impose higher costs that may be viewed as excessive; but the alternative of selling the property and moving somewhere less expensive might be significantly more costly than simply staying put and incurring the expenses.

Additionally, following the language of section 707(b)(2)(B), the debtor must also properly document the deduction, prove there is no reasonable alternative and provide an explanation of the circumstances making the deduction necessary and reasonable.

*Davis*, 2011 WL 5884015, at *4-6 (footnote omitted).

In *Davis,* the debtors listed specific expense deductions (dry cleaning, pool maintenance, lawn maintenance, etc.) and presented evidence at trial to support these expense deductions. After reviewing the evidence introduced by the debtors to support the expense deductions, the court considered (1) whether the expense was necessary and reasonable, and (2) whether there was a reasonable alternative to the expense. *Id.* at *6. The court found some of the debtors' expense deductions were related to *special circumstances* (pool and lawn maintenance) and were allowed, but the court also found that some could not be deducted as an expense (dry cleaning) because they did not relate to *special circumstances.*

In the case at bar, the Court finds that it is unnecessary for this Court to adopt the narrow or the broad view of *special circumstances* because the Debtor has not met her evidentiary burden to properly document any deductions under the Marital Adjustment above the $644.46 the UST agreed she was entitled to deduct for Mr. Robinson's separate expenses. The Court acknowledges that the Debtor is allowed to claim deductions on Line 17 to account for the non-filing spouse's personal expenses,[25] however, the Debtor cannot "arbitrarily pick a number out of the air for a marital

---

[25]*In re Travis,* 353 B.R. at 527.

21

adjustment on [Line 17] without providing sufficient documentation . . . to show that the claimed amounts are properly deducted." *In re Dugan,* No. 07-40899, 2008 WL 3558217, at *5 (Bankr. D. Kan. Aug. 12, 2008).

In the case at bar, the Debtor submitted bank statements[26] which showed withdrawals made by Mr. Robinson, but she testified that above the $644.46, she did not know what Mr. Robinson did with the money he withdrew from their checking account and that she did not know whether she received any benefit from Mr. Robinson's withdrawals from their checking account.[27]  The Court finds that this simply does not meet the proof necessary "to show that the claimed portion of [her] spouse's income is actually and routinely used solely for [his] personal use, and is not otherwise accounted for on [the Means Test]." *Dugan*, 2008 WL 3558217, at *5; *see also In re Fonash,* 401 B.R. at 148) ("[T]o prove 'special circumstances' to avoid a § 707(b) dismissal [a debtor] must file or introduce into the record verified documentation, independent of his schedules and Form 22A, to prove the *bona fide* existence and terms of student loan debt.").

The Court finds that the UST has met its burden of proving abuse and that the Debtor has failed to rebut the presumption of abuse under § 707(b)(2).  Consequently, the above-styled case should be dismissed under § 707(b)(2).

### B.  § 707(b)(3)

In the alternative, the UST requests that the Debtor's case should be dismissed under the *totality of circumstances* test found in § 707(b)(3) because the Debtor has sufficient disposable income to make a meaningful distribution to unsecured creditors.  The Court finds that even if the

---

[26]Trial Exhibit D-1.

[27]Transcript at 23-30.

22

Debtor has properly rebutted the presumption of abuse under § 707(b)(2), the Debtor's case should be dismissed or converted under the *totality of circumstances* embodied in § 707(b)(3).

Section 707(b)(3) provides:

(3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider--

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

"Unlike the 'means test' of § 707(b)(2), which is inherently objective, an analysis under § 707(b)(3) is subjective, requiring that a court conduct a case-by-case examination of a debtor's financial situation and course of conduct." *In re Camp,* 416 B.R. 304, 314 (Bankr. E.D. Tex. 2009)

In analyzing whether dismissal is appropriate under § 707(b)(3), the following factors are to be considered:

(1) Whether the debtor could pay a substantial portion of his debts from future income in a hypothetical Chapter 13 case;

(2) Whether the bankruptcy petition was filed due to sudden illness, calamity, disability, or unemployment;

(3) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(4) Whether the debtor's proposed family budget is reasonable;

(5) Whether the debtor is seeking to reaffirm a large amount of secured debt to the detriment of unsecured creditors;

(6) Whether the debtor's Schedules and Statement of Current Income

23

and Expenses reasonably and accurately reflect his true financial condition;

(7) Whether the debtor has a stable source of income;

(8) Whether the debtor is eligible to file a Chapter 13 case;

(9) Whether there are state remedies or private negotiations that the debtor can invoke to ease his financial predicament;

(10) Whether the debtor's expenses can be reduced without depriving the debtor of basic necessities; and

(11) Whether the petition was filed in good faith.

*In re King,* No. 08–41975, 2009 Bankr.LEXIS 35, at *10–11 (Bankr. E.D. Tex. Jan. 6, 2009). In considering these factors, the overarching focus of the court's inquiry is on the debtor's ability to re-pay his debts. *Id.; In re Kelly,* 841 F.2d 908, 914–15 (9th Cir. 1988); *In re Fitzgerald,* 155 B.R. 711, 716 (Bankr. W.D. Tex. 1993).

*In re McDowell*, No. 12-31231, 2013 WL 587312, at *9-10 (Bankr. S.D. Tex. Feb. 14, 2013).

As noted previously, the changes to § 707(b) made by BAPCPA lower the dismissal standard from "substantial abuse" to abuse.[28] While the Court must consider the conditions which existed when the Debtor filed her petition, "the Fifth Circuit has made clear that this Court may also consider *post-petition* events bearing on these questions in deciding whether to dismiss a case for abuse under section 707(b). *See In re Cortez,* 457 F.3d at 455–56." *McDowell,* 2013 WL 587312, at *10.

### 1. Does the Debtor have the ability to repay a substantial portion of her debts in a hypothetical Chapter 13.

As noted above, the Debtor filed an Amended Schedule J on November 5, 2012. The

---

[28]*See U.S. Trustee v. Hilmes (In re Hilmes),* 438 B.R. 897, 904 (N.D. Tex. 2010) (district court overturned bankruptcy court's decision which applied a *substantial abuse* standard instead of an *abuse* standard, and noting that "Congress has clearly lowered the dismissal standard" by changing it from substantial abuse to abuse).

24

following chart compares the Debtor's Schedule J with her Amended Schedule J:

### SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)

| | Schedule J–Current Monthly Expenditures | Original | Amended | Difference |
|---|---|---|---|---|
| 1 | Rent/Home Mortgage (excluding property taxes & insurance) | $1,317.00 | $1,317.00 | $0.00 |
| 2 | a. Utilities: Electricity & heating fuel | $250.00 | $150.00 | ($100.00) |
| | b. Utilities: Water & Sewer | $65.00 | $65.00 | $0.00 |
| | c. Utilities: Telephone | $0.00 | $0.00 | $0.00 |
| | d. Other See Detailed Expense Attachment | $314.00 | $259.00 | ($55.00) |
| 3 | Home Maintenance (repairs and upkeep) | $0.00 | $0.00 | $0.00 |
| 4 | Food | $900.00 | $500.00 | ($400.00) |
| 5 | Clothing | $200.00 | $0.00 | ($200.00) |
| 6 | Laundry and dry cleaning | $0.00 | $0.00 | $0.00 |
| 7 | Medical and dental expenses | $100.00 | $100.00 | $0.00 |
| 8 | Transportation (not including car payment) | $350.00 | $200.00 | ($150.00) |
| 9 | Recreation, clubs & entertainment, newspapers, magazines, etc. | $100.00 | $0.00 | ($100.00) |
| 10 | Charitable contributions | $100.00 | $100.00 | $0.00 |
| 11 | a. Insurance: Homeowner's /renter's | $0.00 | $0.00 | $0.00 |
| | b. Insurance: Life | $80.00 | $80.00 | $0.00 |
| | c. Insurance: Health | $0.00 | $0.00 | $0.00 |
| | d. Insurance: Auto | $192.00 | $192.00 | $0.00 |
| | e. Insurance: other | $0.00 | $0.00 | $0.00 |

25

| 12 | Taxes: tag, sticker, etc. | $40.00 | $40.00 | $0.00 |
|----|---------------------------|--------|--------|-------|
| 13 | a.  Installment payments: auto | $648.00 | $648.00 | $0.00 |
|    | b.  Installment: other Husband's car payment | $500.00 | $500.00 | $0.00 |
| 14 | Alimony, maintenance, and support paid to others | $0.00 | $0.00 | $0.00 |
| 15 | Payments . . . of add'l dependents not living at your home | $0.00 | $0.00 | $0.00 |
| 16 | Regular expenses from operation of business, profession. . . . | $0.00 | $0.00 | $0.00 |
| 17 | Other See Detailed Expense Attachment | $1,295.00 | $2,312.00 | $1,017.00 |
| 18 | **AVERAGE MONTHLY EXPENSES (Total lines 1-17)** | **$6,451.00** | **$6,463.00** | **$12.00** |

Attached to both Schedule J and Amended Schedule J is a *Detailed Expense Attachment* (Line 2(d.) and Line 17) (Attachment and Amended Attachment). The Amended Attachment differs from the Attachment in the following manner: four line items were deleted, one line item was added and dollar amounts were changed.  The chart below shows the differences between the Attachment and the Amended Attachment:

(See next page.)

26

### SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)
**Detailed Expense Attachment**

| | Detailed Expense Attachment | Original | Amended | Difference |
|---|---|---|---|---|
| 2 | d.  Other Utility Expenses: cell phone | $255.00 | $170.00 | ($85.00) |
| | Other Utility Expenses: Cable/internet/telephone bundle pkg | $89.00 | $89.00 | $0.00 |
| | **Total Other Utility Expenditures** | **$314.00** | **$259.00** | **($55.00)** |
| | | | | |
| 17 | Other Expenditures: | | | |
| | Household/personal care items | $300.00 | $100.00 | ($200.00) |
| | Pet expenses | $10.00 | $0 | ($10.00) |
| | Lawn maintenance | $30.00 | $30.00 | $0.00 |
| | Personal grooming | $100.00 | $0.00 | ($100.00) |
| | Non-filing spouse's separate obligations | $0.00 | $1,565.00 | $1,565.00 |
| | Childcare/afterschool care | $500.00 | $500.00 | $0.00 |
| | Cigarettes | $168.00 | $0.00 | ($168.00) |
| | HOA dues | $40.00 | $40.00 | $0.00 |
| | Accounting/tax preparation | $17.00 | $17.00 | $0.00 |
| | School supplies & school lunches | $60.00 | $60.00 | $0.00 |
| | Extracurricular activities | $70.00 | $0.00 | ($70.00) |
| | **Total Other Expenditures** | **$1,295.00** | **$2,312.00** | **$918.00** |

According to the Debtor's original calculations on Schedule I and Schedule J, the household income exceeds the household expenses by $13.99 per month.  When comparing Amended Schedule J and Schedule I, the household income exceeds the household expenses by only $1.99 per month.

**a.  Income**

27

At trial, the UST submitted several exhibits in support of its position that the Debtor could pay a substantial portion of her debts in a Chapter 13. Trial Exhibits UST 14 and 15 are pay advices for the Debtor and Mr. Robinson ending in December of 2012. Mrs. Baronich used the year-to-date totals in these two pay advices to calculate the Debtor's annual income and Mr. Robinson's annual income. Mrs. Baronich testified that "looking at an annualized income gives a broader perspective of what [the Debtor and Mr. Robinson] actually earn each year." Transcript at 46.

Using the Debtor's and Mr. Robinson's annual income, the UST found that when compared to the Debtor's Schedule I,[29] the Debtor's monthly gross income was higher than reported on Schedule I:

Schedule I: $4,710.84    UST: $5,191.27[30]

Using Mr. Robinson's annual income, the UST found that when compared to the Debtor's Schedule I, Mr. Robinson's monthly gross income was also higher than reported on Schedule I:

Schedule I: $3,330.38    UST: $3,585.39[31]

Using the Debtor's annual income to calculate the Debtor's net monthly income, the UST found that the Debtor made more than reported on Schedule I:

Schedule I: $3,782.12    UST: $4,179.25[32]

Using Mr. Robinson's annual income to calculate Mr. Robinson's net monthly income, the UST found that Mr. Robinson made less than reported on Schedule I:

---

[29]When she filed amended schedules, the Debtor did not file an amended Schedule I.

[30]Trial Exhibit UST 16 Line 1 *Monthly gross wages, salary, and commissions (pro rate if not paid monthly)*.

[31]*Id.*

[32]*Id.* at Line 6 *Total Net Monthly Take Home Pay*.

Schedule I: $2,682.87    UST: $2,564.16[33]

In addition to adjustments to their income, the UST also adjusted the amount of the 401K loan the Debtor was repaying from $119.28 to $102.96 to accurately reflect what was reported on the Debtor's year-to-date pay advice.[34]

Finally, the UST adjusted the payroll deductions for both the Debtor and Mr. Robinson. Schedule I reported that the Debtor's payroll deductions were $928.72, whereas the UST showed her payroll deductions to actually be $1,012.03. As for Mr. Robinson, Schedule I reported his payroll deductions to be $647.52, but the UST showed his payroll deductions to actually be $1,021.23.[35]

Schedule I shows monthly combined income of $6,464.99. After making the adjustments to their income, their payroll deductions and the Debtor's 401K loan, the UST calculated that the Debtor and Mr. Robinson had a combined monthly income of $6,743.41 which was higher than the $6,464.99 reported by the Debtor on Schedule I.[36]

### b. Expenses

Trial Exhibit UST 17 is a comparison of the Debtor's Schedule J, Amended Schedule J and the UST's budget. In completing Trial Exhibit UST 17, the UST used the exact same expenses the Debtor listed in her Amended Schedule J. The only difference between the Debtor's Amended Schedule J and Trial Exhibit UST 17, is that the UST used as the Debtor and Mr. Robinson's average monthly income the higher figure of $6,743.41–the amount Mrs. Baronich calculated using

---

[33]*Id.*

[34]*Id.* at Line 4 *Less Payroll Deductions d.  Other (specify) ii. 401k loan payment*.

[35]*Id.* at Line 5 *Subtotal of Payroll Deductions*.

[36]*Id.* at Line 16 *Combined Average Income*.

the Debtor and Mr. Robinson's annual salary from their December 2012 pay advices.

### SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)[37]

| | Schedule J–Current Monthly Expenditures | Original | Amended | UST's Budget |
|---|---|---|---|---|
| 1 | Rent/Home Mortgage (excluding property taxes & insurance) | $1,317.00 | $1,317.00 | $1,317.00 |
| 2 | a. Utilities: Electricity & heating fuel | $250.00 | $150.00 | $150.00 |
| | b. Utilities: Water & Sewer | $65.00 | $65.00 | $65.00 |
| | c. Utilities: Telephone | $0.00 | $0.00 | $0.00 |
| | d. Other See Detailed Expense Attachment | $314.00 | $259.00 | $259.00 |
| 3 | Home Maintenance (repairs and upkeep) | $0.00 | $0.00 | $0.00 |
| 4 | Food | $900.00 | $500.00 | $500.00 |
| 5 | Clothing | $200.00 | $0.00 | $0.00 |
| 6 | Laundry and dry cleaning | $0.00 | $0.00 | $0.00 |
| 7 | Medical and dental expenses | $100.00 | $100.00 | $0.00 |
| 8 | Transportation (not including car payment) | $350.00 | $200.00 | $200.00 |
| 9 | Recreation, clubs & entertainment, newspapers, magazines, etc. | $100.00 | $0.00 | $0.00 |
| 10 | Charitable contributions | $100.00 | $100.00 | $100.00 |
| 11 | a. Insurance: Homeowner's /renter's | $0.00 | $0.00 | $0.00 |
| | b. Insurance: Life | $80.00 | $80.00 | $80.00 |
| | c. Insurance: Health | $0.00 | $0.00 | $0.00 |
| | d. Insurance: Auto | $192.00 | $192.00 | $192.00 |

---

[37]Trial Exhibit UST 17.

30

|    |                                                                      |            |            |            |
|----|----------------------------------------------------------------------|------------|------------|------------|
|    | e.  Insurance: other                                                 | $0.00      | $0.00      | $0.00      |
| 12 | Taxes: tag, sticker, etc.                                            | $40.00     | $40.00     | $40.00     |
| 13 | a.  Installment payments: auto                                       | $648.00    | $648.00    | $648.00    |
|    | b.  Installment: other Husband's car payment                         | $500.00    | $500.00    | $500.00    |
| 14 | Alimony, maintenance, and support paid to others                     | $0.00      | $0.00      | $0.00      |
| 15 | Payments . . . of add'l dependents not living at your home           | $0.00      | $0.00      | $0.00      |
| 16 | Regular expenses from operation of business, profession. . . .       | $0.00      | $0.00      | $0.00      |
| 17 | Other See Detailed Expense Attachment                                | $1,295.00  | $2,312.00  | $1,017.00  |
|    | Household/personal care items                                        | $300.00    | $100.00    | $100.00    |
|    | Pet expenses                                                         | $10.00     | $0.00      | $0.00      |
|    | Lawn Maintenance                                                     | $30.00     | $30.00     | $30.00     |
|    | Personal Grooming                                                    | $100.00    | $0.00      | $0.00      |
|    | Childcare/after school care                                          | $500.00    | $00.00     | $500.00    |
|    | Cigarettes                                                           | $168.00    | $0.00      | $0.00      |
|    | HOA dues                                                             | $40.00     | $40.00     | $40.00     |
|    | Accounting/tax preparation                                          | $17.00     | $17.00     | $17.00     |
|    | School supplies & school lunches                                     | $60.00     | $60.00     | $60.00     |
|    | Extracurricular activities                                           | $70.00     | $0.00      | $0.00      |
|    | Non-filing spouse's separate obligations                             | $0.00      | $1,565.00  | $1,565.00  |
| 18 | **Average Monthly Expenses** (Total Lines 1 - 17)                    | $6,451.00  | $6,463.00  | $6,463.00  |

| 19 | Describe any increase or decrease in expenditures reasonable anticipated[38] | | | |
|----|------|------|------|------|
| 20 | **Statement of Monthly Net Income** | | | |
|    | a.  Avg. monthly income from Line 15 of Schedule I | $6,464.99 | $6,464.99 | $6,743.41 |
|    | b.  Avg. monthly expenses from Line 18 | $6,451.00 | $6,463.00 | $6,463.00 |
|    | c. Monthly net income (a minus b) | $13.99 | $1.99 | $280.41 |

Consequently, by the UST's calculations, the Debtor has $280.41 in monthly net income. The UST further calculated that if the Debtor was in a Chapter 13 case, it would require $288.17 per month for the Debtor to pay 100% to her unsecured creditors ($17,290.13).

### c.  Analysis of Expenses and Income

The Court notes that when the Debtor filed Amended Schedule J, she reduced and/or eliminated many of the expenses listed in her Schedule J.  However, after reducing her expenses, she then countered the reductions and/or eliminated expenses by adding $1,565.00 as Mr. Robinson's separate obligations.  The net result of the Debtor's amendments to her schedules was that she claimed her monthly disposable income decreased.

The Court understands that there are situations where a debtor needs to amend his/her schedules post-petition to correct errors and/or add creditors.  However, the Court finds it curious that it was not until the UST had raised the § 707(b) objection that the Debtor saw the need to amend her schedules. While not ruling so in the case at bar because it makes no difference to the outcome,

---

[38]Mrs. Baronich testified that according to the documents and/or testimony of the Debtor, the Debtor's 401K loan would be repaid around September of 2013, thus giving the Debtor an additional $102.96 per month.  In addition, she also testified that when the Debtor's vehicle loan was paid off in October of 2014, the Debtor would have an additional $648.00 per month.  Transcript at 50. However, neither the UST nor the Debtor included either of these figures on Line 19.

the Court notes that several courts have held that a debtor is bound by his/her original schedules and may not unilaterally change the expenses claimed after the UST has raised a § 707(b) objection. *See McDowell*, 2013 WL 587312, at *12; *In re Logan,* 2003 Bankr. LEXIS 600, at *12 (Bankr. N.D. Tex. June 17, 2003) ("The debtors signed and submitted their original Schedule J under penalty or perjury [and] have not established a basis to increase these expenses post-petition.").

As for expenses claimed by the Debtor, the Debtor and Mr. Robinson pay a total of $1,580 per month for their automobiles ($1,148.00 car payments; $192.00 insurance; $200.00 other transportation expenses; and $40.00 tag). While not binding on a § 707(b)(3) abuse determination, the IRS standard for vehicle costs is only $517 per vehicle per month. The Debtor has not sought to reaffirm the debt on her vehicle, but the Court assumes that if the Debtor is permitted to stay in a Chapter 7, the Debtor will enter into a reaffirmation agreement on her vehicle. In doing so, the Debtor will be reaffirming this secured debt while avoiding paying her unsecured creditors.

The Court acknowledges that the Debtor's 401K loan payment of $102.96 is not a large sum of money, but it is a deduction that is included in the Debtor's monthly expenses. While not raised by the UST, several courts have held that the repayment of a 401K loan is not a debt within the meaning of the Bankruptcy Code and should not be allowed as an expense deduction from a debtor's monthly disposable income.

> Because the debtor's loan repayment obligation is not a "claim" or "debt" under the Bankruptcy Code, the debtor may not include payments on such loans as a deduction for purposes of the means test under § 707(b)(2). *See, e.g., In re Smith,* 388 B.R. at 888; *In re Mowris,* 384 B.R. at 237–38; *McVay,* 371 B.R. at 203; *Thompson,* 370 B.R. at 768–72. This conclusion under BAPCPA is not only supported by the definitions of "claim" and "debt" within the Code, but also by two basic canons of statutory construction.

*Egebjerg v. Anderson (In re Egebjerg)*, 574 F.3d 1045, 1050 (9th Cir. 2009); *see also  Bolen v. Adams,* 403 B.R. 396, 402 (N.D. Miss. 2009) (loan from debtor's retirement account is a debt within

33

the meaning of the Bankruptcy Code only if plan administrator has a claim for repayment); *McVay v. Otero*, 371 B.R. 190 (W.D. Tex. 2007).

As for the Debtor and Mr. Robinson's income, the Court finds that the UST's determination of the Debtor and Mr. Robinson's monthly salary based upon the year-to-date figures contained in their December 2012 pay advices is a more accurate calculation of both of their monthly salaries. As noted, based on Mr. Robinson's year-to-date numbers, Mr. Robinson's <u>net</u> monthly income was actually less than reported by the Debtor in Schedule I.[39]  Based upon the Debtor's year-to-date numbers, her <u>net</u> monthly income was more than reported on Schedule I.[40]

Using the Debtor's and Mr. Robinson's monthly average salary as calculated by the UST, the Court finds that the Debtor has monthly net income of $280.41 per month and can pay a substantial distribution to her unsecured creditors in a Chapter 13 case.[41]  Consequently, this factor weighs in favor of dismissal.

### 2.  Other factors considered when determining whether abuse exists.

The Debtor and Mr. Robinson both have stable jobs and have been working for their respective employers for many years: the Debtor has worked for Blue Cross for seventeen (17) years, and Mr. Robinson has worked for Comcast for sixteen (16) years.  There was no testimony or proof that the Debtor filed this current bankruptcy petition due to a sudden illness or disability of her or any of her family members nor was the case filed due to unemployment.  These factors weigh in favor of dismissal.

---

[39]Trial Exhibit UST 16 Line 6 *Total Net Monthly Take Home Pay*.

[40]*Id.*

[41]Trial Exhibit UST 17 Line 20 *Statement of Monthly Net Income c.  Monthly net income (a. minus b.)*

The bank statements from the Debtor and Mr. Robinson's joint checking account[42] show that cash withdrawals were made from their checking account. The Debtor testified that Mr. Robinson made these withdrawals and that Mr. Robinson regularly obtained cash advances from pay day loan companies; however, the Debtor did not know what happened to these funds.[43] According to the Amended Means Test, the Debtor asserts that Mr. Robinson spends more per month than his take home pay.[44] Further, it appears that Mr. Robinson's expenses can be reduced without depriving the Debtor and her family the basic necessities. These factors weigh in favor of dismissal.

The Court will also note that between the Debtor and Mr. Robinson, this is the third Chapter 7 bankruptcy petition they have filed:

(See next page.)

---

[42]Trial Exhibit D-1.

[43]Transcript at 64-65.

[44]Trial Exhibit UST 2.

Otinma Monick Robinson
Chapter 7 Proceeding: 12-02313ee[45]

| Name of Filer: | Date Filed/ Date Discharged: | Chapter: | Amount of Unsecured Debt: |
|---|---|---|---|
| Albert D. Robinson & Otinma M. Robinson | January 19, 2000 May 18, 2000 | Chapter 7 | $18,287.00 |
| Albert D. Robinson | December 14, 2009 April 27, 2010 | Chapter 7 | $35,080.98 |
| Otinma M. Robinson | July 18, 2012 | Chapter 7 | $15,049.68 (this figure excludes the $2,240.45 on which Debtor could avoid the lien) |

The Debtor testified that the reason she and Mr. Robinson filed the Chapter 7 case in 2000 was because of excessive medical bills they incurred as a result of their child being born prematurely.[46] However, under questioning from the UST, the Debtor could only identify on their schedules medical debts totaling approximately $500.00.[47] The Debtor also testified that she had no independent knowledge of what was contained in Mr. Robinson's 2009 bankruptcy filing.[48]

The Court finds the filing by the Debtor and Mr. Robinson of two (2) Chapter 7 bankruptcy cases within a three (3) year period in which they are seeking to discharge over $50,000.00 (Mr. Robinson $35,080.98 and the Debtor a minimum of $15,049.68) in unsecured debt weighs in favor of dismissal.

---

[45]See Trial Exhibit UST 19.

[46]Transcript at 22.

[47]Transcript at 32-33.  Trial Exhibit UST 3.

[48]Transcript at 22-23.

36

### 3. Summary

When the United States Congress enacted § 707(b) and amended it under BAPCPA, it determined that those debtors who filed a bankruptcy petition in bad faith or those debtors, who based on a *totality of circumstances,* have the ability to pay their debts "should not be afforded the benefits of an immediate fresh start, but, instead, should have their fresh start conditioned on the repayment of at least a portion of their unsecured debts." *Camp,* 416 B.R. at 314.

The Court finds the Debtor in the case at bar has the ability to pay at least a portion of her unsecured debts. Consequently, for the foregoing reasons, the Court finds that based on the *totality of the circumstances*, the Debtor's case should be dismissed because the financial situation of the Debtor demonstrates abuse under § 707(b)(3).

### CONCLUSION

The Court finds that the Debtor failed to provide sufficient documentation or any other proof to substantiate the entire $1,565.00 she claimed as the Marital Adjustment on Line 17 of her Amended Means Test. Since the Debtor could only substantiate $644.46, that is the amount she can claim as her Marital Adjustment on Line 17. Consequently, the Court finds that the Debtor's Monthly Disposable Income is $310.06, for purposes of § 707(b)(2) (Line 50). Since the Debtor failed to show special circumstances to rebut the presumption of abuse, the Court finds that the case should be dismissed for abuse under § 707(b)(2) .

Further, the Court finds that based upon the *totality of the circumstances* set forth in § 707(b)(3), the Debtor has the financial ability to repay her creditors and to allow her to proceed in a Chapter 7 case would be an abuse under § 707(b)(3). The Debtor and Mr. Robinson both have stable incomes and no evidence was submitted to show that either the Debtor or Mr. Robinson are unable to work. The evidence at trial shows that Mr. Robinson has been living beyond his means

at the expense of both his and his wife's creditors.  The Court is not unsympathic to the Debtor's

situation in that she appears to be in a marriage where very little communication occurs between the

Debtor and her husband regarding their finances.  However, this is the third bankruptcy filing

between the Debtor and Mr. Robinson.  If the Court allowed the Debtor to remain in her current

Chapter 7, the Debtor and Mr. Robinson would have discharged over $50,000.00 in unsecured debt

in a three-year period.

The Debtor will be given 14 (fourteen) days from the date of this opinion, being Wednesday,

October 23, 2013, to file a motion to convert her case to a Chapter 11 or a Chapter 13 case.[49]  If the

Debtor does not file a motion to convert her Chapter 7 case to a Chapter 11 or a Chapter 13 case on

or before Wednesday, October 23, 2013, then the above-styled case will be dismissed by separate

order of the Court without further notice.

A separate judgment consistent with this opinion will be entered in accordance with Rule

7054 and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

*Edward Ellington*

Edward Ellington
United States Bankruptcy Judge
Dated: October 9, 2013

---

[49]If the Debtor chooses to convert her Chapter 7 case to a Chapter 11 or a Chapter 13 case, the Court is not holding that the Debtor must pay $280.41 (Line 20) to her unsecured creditors nor is the Court ruling that the Debtor must pay 100% to her unsecured creditors.  Rather, the Court finds that the Debtor's monthly disposable income shows that she is able to pay a substantial distribution to her unsecured creditors, what ever that percentage is determined to be.